**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

AMBER MONTGOMERY,
Plaintiff,

v.

**Civil Action No. ________________**

MICROSOFT CORPORATION,
Defendant.
___________________________________/

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

**(Jury Trial Demanded)**

Plaintiff Amber Montgomery, by and through undersigned counsel, brings this Complaint against Defendant Microsoft Corporation and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for damages and equitable relief arising from Defendant's unlawful discrimination, retaliation, and interference with Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.*; the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140.

2. Plaintiff was a high-performing Senior Program Manager at Microsoft who was targeted for termination after announcing her pregnancy and requesting medical leave for pregnancy-related complications. Despite consistently excellent performance reviews, including work on a patent-pending AI feature, Plaintiff was informed that her position was being eliminated while she was on protected FMLA and disability leave—while holding her newborn child. Microsoft then kept her in employment limbo for over a year, blocking her return to any position, before finally issuing a termination notice.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this case arises under federal law, including Title VII, the FMLA, the ADA, and ERISA.

4. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district, Plaintiff resides in this district, and Defendant transacts substantial business in this district.

6. Plaintiff has satisfied all administrative prerequisites to filing this action. Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Plaintiff a Notice of Right to Sue on September 23, 2025. This Complaint is filed within 90 days of receipt of that notice.

## PARTIES

7. Plaintiff Amber Montgomery is an adult individual and citizen of the State of Georgia, residing in Cobb County within this judicial district. Plaintiff is a licensed attorney admitted to practice in the States of Georgia and Washington.

8. Defendant Microsoft Corporation is a corporation organized and existing under the laws of the State of Washington, with its principal place of business at One Microsoft Way, Redmond, Washington 98053. Defendant is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), the FMLA, 29 U.S.C. § 2611(4), the ADA, 42 U.S.C. § 12111(5), and ERISA, 29 U.S.C. § 1002(5), and employs more than 500 employees.

## FACTUAL ALLEGATIONS

### *Plaintiff's Employment and Exemplary Performance*

9. In July 2021, Defendant hired Plaintiff as a Senior Program Manager in the Cloud for Sustainability division.

10. Throughout her tenure, Plaintiff consistently received positive performance feedback and was entrusted with critical, revenue-generating projects.

11. Plaintiff's managers described her as "the heart and soul of the top 3 priority areas" of her product team. She led the company's carbon reporting efforts and subsequently led the implementation of five Scope 3 emissions categories—among the most technically complex calculations in the entire platform, requiring mastery of chemistry and emissions science that Plaintiff taught herself. These categories represented at least 10% of all calculations in Microsoft's Cloud for Sustainability platform.

12. Plaintiff developed an AI-powered calculation tool for which Microsoft filed a patent application. Plaintiff's work was showcased as a highlight at both GreenBiz, a major sustainability conference, and Microsoft Ignite, Defendant's flagship technology conference. Plaintiff was initially invited to attend and present at GreenBiz, including presentations typically reserved for leadership. However, due to health conditions requiring accommodations, Plaintiff requested adjustments to enable her attendance. Defendant refused these accommodations, and Plaintiff was unable to attend or present her own work. Plaintiff was never invited to attend Microsoft Ignite. Despite being denied the opportunity to present, Defendant continued to feature Plaintiff's work at these conferences without her. Additionally, when Plaintiff was nine months pregnant, her manager Robin Smith suggested that Plaintiff create a marketing video but advised against speaking in it, claiming Plaintiff's voice did not “sound good”—further marginalizing Plaintiff from visibility opportunities during her pregnancy.

13. Plaintiff created 153 new calculation models for the platform. She personally integrated complex international emissions data, including historical EPA factors, ADEME factors from France comprising over 17,000 rows of data, EXIOBASE factors, and Taiwan Ministry of Environment emission factors. Plaintiff's work was "essential to the 25% upsell"

that occurred within her product, directly contributing to millions of dollars in revenue growth.

14. Throughout her tenure, Plaintiff was never rated "LITE" (Low Impact, Talent Eliminated) and was never placed on a performance improvement plan. Critically, Plaintiff's May 2024 performance review—completed *after* she announced her pregnancy and requested extended leave—continued to praise her contributions. Her manager wrote that Plaintiff was "naturally very inclusive" and noted her essential role in the product's revenue growth. This positive review, issued after Defendant knew of Plaintiff's pregnancy and leave needs, undermines any claim that the subsequent termination was performance-based.

***Prior Pregnancy Loss and Pattern of Conduct***

15. In 2022, during Plaintiff's first pregnancy, her then-manager Brandon Potter removed Plaintiff from the standard reporting structure and reassigned her to report to Alejandro Gutierrez, a peer who was not in a management role and had no management authority. Plaintiff was the only employee on the team subjected to this isolated reporting arrangement; all other team members continued to report directly to Brandon Potter. Mr. Gutierrez had expressed a desire for management experience, and Defendant assigned their pregnant, disabled employee to him as his sole direct report.

16. This isolated reporting structure deprived Plaintiff of access to her actual supervisors, excluded her from regular team meetings and advancement opportunities, and undermined her ability to demonstrate her performance to decision-makers. When Plaintiff raised concerns about Alejandro Gutierrez's lack of support and contradictory directives, Brandon Potter repeatedly ignored her requests for assistance. Even after Robin Smith later became Plaintiff's manager and intervened on Plaintiff's behalf to arrange a meeting, Brandon Potter refused to meet with Plaintiff to discuss her concerns.

17. Upon returning from bereavement leave following her miscarriage, Plaintiff discovered her responsibilities had been drastically altered without explanation. Before her leave, Plaintiff had been leading development of the Reporting Suite—a high-visibility, mission-critical feature. Upon her return, she was reassigned to a far less visible project with minimal opportunity for meaningful contributions or career growth. Plaintiff did not file a formal complaint at that time because she hoped that by continuing to deliver excellent work, she would overcome any bias. She did not recognize the pattern until the same treatment—and worse—occurred following her subsequent pregnancy. This prior course of conduct is offered to demonstrate Defendant's pattern and practice of discriminating against employees who experience pregnancy-related medical events, and to show motive, intent, and absence of mistake pursuant to Fed. R. Evid. 404(b).

***Plaintiff's Pregnancy and Protected Leave***

18. In approximately January 2024, Plaintiff informed her manager and Human Resources that she was pregnant with her second child.

19. During her second pregnancy, Plaintiff escalated her concerns about ongoing workplace issues to Shefy Manayil Kareem, Brandon Potter's manager. Before meeting with Mr. Kareem, Plaintiff—who was visibly pregnant—was left sitting on the floor outside a conference room for approximately fifteen minutes while waiting for him to finish another meeting. When Plaintiff finally entered the meeting and explained her health struggles and the stress caused by her work environment, Mr. Kareem dismissed her concerns, attributing

her physical symptoms to being "intimidated by him" rather than acknowledging the legitimate work-related stressors. The prolonged stress and hostile work environment during this period contributed to Plaintiff's pregnancy complications.

20. In June 2024, Plaintiff commenced FMLA-protected leave due to serious pregnancy-related medical complications.

21. While hospitalized with pre-eclampsia—a serious and potentially life-threatening pregnancy complication—Plaintiff sought guidance from Microsoft's internal Human Resources support line regarding her benefits. The HR representative provided incorrect advice, telling Plaintiff that Microsoft would pay her directly during her hospitalization. Microsoft's internal HR support line consistently went to voicemail with no return calls, and the third-party contractors staffing the benefits hotline did not understand Microsoft's policies. Had Plaintiff relied on this incorrect advice, she would not have received any income during her hospitalization.

22. Recognizing that HR's advice was incorrect, Plaintiff—while still hospitalized with a serious medical condition—was forced to independently contact Prudential to initiate her short-term disability claim before giving birth. Even then, Microsoft's benefits administrator, Blue Cross Blue Shield, initially denied coverage for Plaintiff's hospitalization, forcing her to appeal the denial while managing a high-risk pregnancy. Plaintiff has been required to fight for every benefit she is legally entitled to receive.

23. Plaintiff gave birth in July 2024.

24. Due to continuing medical conditions, Plaintiff remained on approved leave, transitioning to short-term disability and subsequently to long-term disability through Defendant's benefits program administered by Prudential.

25. In early November 2024, Plaintiff informed her manager and Human Resources that she would need extended medical leave through January 2025. Her manager verbally approved this request.

26. Human Resources initially instructed Plaintiff that she could not formally submit her extended leave request until closer to the end of November 2024. Plaintiff was forced to escalate to the Head of Human Resources before she was permitted to submit her request.

27. After Plaintiff escalated, Human Resources reluctantly permitted her to request additional leave for her documented medical condition—a condition Plaintiff had already disclosed and for which she had previously been approved for leave. However, HR imposed an additional requirement: Plaintiff's extended leave would only be granted if approved by Prudential, the third-party disability administrator.

28. Prudential's standard approval process typically takes approximately ten business days. However, due to Microsoft's delays in permitting Plaintiff to submit her request, Plaintiff had only a few days—during the week of Thanksgiving 2024—to obtain Prudential's approval before facing imminent termination. This compressed timeline appeared designed to create an impossible administrative hurdle. By some measure of fortune, Prudential approved Plaintiff's request within this unreasonably short window.

### *The Discriminatory and Retaliatory Termination Decision*

29. On November 12, 2024—before Plaintiff could submit her formal extended leave request—she received a phone call from Jacqueline Brinker, a Human Resources representative Plaintiff had never previously met.

30. While Plaintiff was holding her newborn infant, Ms. Brinker informed her that her position had been eliminated.

31. This notification occurred without prior warning, without consultation with Plaintiff's direct manager or department leadership, and without any opportunity for meaningful dialogue.

32. Ms. Brinker further instructed Plaintiff that she was prohibited from contacting her manager or upper management, and that they had been instructed not to communicate with her.

33. In its Position Statement submitted to the EEOC, Microsoft made critical admissions. First, Defendant conceded that the decision to eliminate Plaintiff's role was made in "late August or early September 2024"—while she remained on protected FMLA leave. This admission constitutes direct evidence that Defendant targeted Plaintiff for termination during a period when federal law expressly protected her employment. Second, Microsoft claimed in its Position Statement that Plaintiff received a "Slightly Lower Impact Than Expected" performance rating. This claim is demonstrably false. In written communications dated April 25 and April 29, 2025, Microsoft Human Resources confirmed to Plaintiff: "You are not rated as LITE… there isn't any other information that they can share around your performance" and "The system doesn't track ratings in the way you are referring… only bonus, pay increase, and stock awards." Microsoft's own Performance Guidelines state that employees are "not given a formal performance rating" because "it goes against our growth mindset culture." Defendant's fabrication of a non-existent performance rating to justify Plaintiff's termination constitutes direct evidence of pretext.

34. The decision to eliminate Plaintiff's position came immediately after she requested extended medical leave—a textbook example of retaliatory timing.

### *Microsoft's Policy Violations*

35. Microsoft's written Maternity Leave Policy explicitly states that employees returning from maternity leave will be reinstated to the same or a comparable position.

36. Microsoft's FMLA policy states that "[u]pon return from an FMLA-covered leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms."

37. Microsoft failed to comply with these policies.

38. Microsoft maintains comprehensive anti-discrimination, anti-retaliation, and equal employment opportunity policies. Defendant provides mandatory training on these policies to all managers and supervisors, including training on the requirements of Title VII, the ADA, the FMLA, and other federal employment laws. Despite this training and these policies, Defendant's managers—including Brandon Potter, Shefy Manayil Kareem, and Robin Smith—engaged in the discriminatory and retaliatory conduct alleged herein. Microsoft's conduct violated its own internal policies designed to protect employees on pregnancy and medical leave, and was undertaken with knowledge that such conduct was unlawful.

### *The Extended Limbo Period*

39. Following the November 2024 notification, Microsoft did not immediately terminate Plaintiff's employment. Instead, Defendant kept Plaintiff on payroll for over one year while refusing to assign her any work or restore her to a position.

40. Other employees affected by the November 2024 layoff were offered severance packages. Plaintiff was informed that she would only be offered severance upon formal termination—not while she remained on disability leave.

41. Throughout the mediation process, Defendant's settlement offers required Plaintiff to resign her employment. At the time, Plaintiff was receiving long-term disability benefits through Defendant's ERISA-governed benefit plan. Resignation would have immediately terminated Plaintiff's eligibility for these disability benefits, leaving her and her family without income or medical coverage. Defendant's insistence on resignation as a condition of settlement effectively sought to coerce Plaintiff into forfeiting the very benefits she was legally entitled to receive.

42. During the limbo period, Robin Smith—Plaintiff's manager who had advocated for her—left the Cloud for Sustainability team, though she remained employed by Microsoft. Despite the fact that Plaintiff had filed an investigation request and specific complaints against Brandon Potter, Defendant designated Brandon Potter as Plaintiff's direct manager while she remained on leave. Rather than assign Plaintiff to another manager within the organization or to Robin Smith's new team, Defendant deliberately placed Plaintiff under the supervision of the very individual against whom she had lodged complaints.

43. This designation meant that every hiring manager considering Plaintiff for internal positions went to Brandon Potter—the very person against whom Plaintiff had lodged complaints—for feedback on her candidacy.

44. During this period, Plaintiff applied for at least two internal positions for which she was qualified.

45. Plaintiff advanced to the final interview round for both positions. However, in both cases, after the hiring managers confirmed that they had consulted with Brandon Potter for feedback on Plaintiff, the interviews were cancelled or the positions were suddenly no longer being filled.

46. In one instance, Plaintiff's final-round interview was cancelled just hours before it was scheduled to occur. The hiring manager subsequently confirmed that he had spoken with Brandon Potter the afternoon or evening before the scheduled interview. Following that conversation, the interview was cancelled.

47. In both instances, Microsoft decided not to fill either position, rather than hire Plaintiff.

48. These decisions not to fill positions for which Plaintiff was a final-round candidate demonstrate Microsoft's intent to exclude Plaintiff from employment regardless of her qualifications.

49. The prolonged limbo period prevented Plaintiff from seeking other employment, as she remained technically employed by Microsoft.

### *The Formal Termination*

50. In November 2025, more than one year after the initial notification of position elimination, Microsoft issued Plaintiff formal notice of termination effective January 17, 2026.

51. In communications with Plaintiff, a Microsoft Human Resources representative stated that employees are "usually laid off after a year of disability leave." This statement suggests that Microsoft maintains an unofficial policy or practice of terminating employees who take extended disability leave—regardless of their qualifications, performance, or ability to return to work.

52. Such a policy, if it exists, would constitute facial discrimination against individuals with disabilities in violation of the ADA and would demonstrate that Plaintiff's termination was part of a systematic practice rather than an isolated business decision. Evidence of disparate treatment is further demonstrated by comparator data: In the November 2024 layoff affecting Robin Smith's team, four of six employees (66%) were terminated—compared to a 13.4% layoff rate organization-wide. All four terminated employees were age 38 or older: Plaintiff (age 38) and three other employees (ages 58, 48, and 40). The only two employees retained were ages 23 and 26. Both retained employees were subsequently promoted. The youngest employee (age 23) received at least two promotions during her short tenure. The 26-year-old employee was approved to relocate across the country, with Defendant paying for her moving expenses and increased cost of living—while Plaintiff's medically necessary transfer request to Washington State was denied. This pattern demonstrates that Defendant's purportedly neutral "reduction in force" disproportionately targeted older employees and employees on protected leave, while retaining and advancing younger employees with less experience and tenure.

53. Defendant's decisionmakers were aware of Plaintiff's protected leave status and medical conditions at the time of the challenged actions. No similarly situated employee who was not on protected leave or who did not have a disability was treated in the same manner as Plaintiff. Other employees whose positions were affected by the reorganization were reassigned, retained, or offered immediate severance—treatment that was denied to Plaintiff.

54. Microsoft's prolonged course of conduct—eliminating Plaintiff's position while on FMLA leave, initially preventing her from formally requesting extended leave until she escalated to the Head of Human Resources, keeping her in employment limbo for over a year, and ultimately terminating her—constitutes a continuing pattern of discrimination and retaliation.

55. After Robin Smith's team was dismantled and its oldest and disabled members terminated, Defendant hired contractors to perform the same work previously performed by the terminated employees. Defendant also engaged in multiple reorganizations that appeared designed to obscure the true impact of the layoffs and undermine any claim that the positions were legitimately eliminated. The hiring of contractors to perform the same work demonstrates that Defendant's stated "business necessity" justification was pretextual.

56. Defendant did not apply objective, role-neutral criteria in selecting Plaintiff's position for elimination, nor did Defendant contemporaneously document any such criteria. Defendant cannot identify any contemporaneous document showing that Plaintiff's role was selected for elimination based on neutral criteria. Upon information and belief, no written

policy or procedure governed the selection of positions for elimination, and Plaintiff's selection was the product of individualized decision-making influenced by her protected status.

***Associational Disability Discrimination***

57. In September 2024, Plaintiff submitted a formal written request to transfer to Microsoft's Washington State offices to access specialized medical services for her minor child, who has a qualifying disability under the ADA. Plaintiff's child requires Applied Behavior Analysis ("ABA") therapy and other specialized services, the costs of which are covered by Microsoft's employee health benefits plan. Defendant was aware that Plaintiff's child's medical care represented a substantial ongoing expense to its benefits plan—approximately $600,000 annually.

58. Microsoft denied this transfer request.

59. Plaintiff also requested 100% remote work as a reasonable accommodation for her pregnancy-related medical conditions. Defendant denied this request, requiring Plaintiff to report to the office at least three days per week. Defendant granted 100% remote work to other employees who did not have disabilities requiring such accommodation, including Plaintiff's own supervisor.

60. The denial of Plaintiff's transfer request, combined with the subsequent elimination of her position, constitutes discrimination based on Plaintiff's association with an individual with a disability in violation of the ADA.

***Benefits Interference***

61. Microsoft improperly classified Plaintiff's post-maternity medical leave as a continuation of her prior leave rather than a new qualifying disability event, thereby depriving her of the full short-term disability benefits to which she was entitled. Additionally, in December 2024, while Plaintiff was on approved 100% paid short-term disability leave, Microsoft issued her a paycheck for $0.00. HR personnel had prematurely removed Plaintiff from the payroll system, requiring her to personally escalate the issue to receive the compensation she was legally entitled to during her approved leave.

62. This classification reduced Plaintiff's long-term disability coverage and caused her economic harm.

63. Microsoft's actions were taken to interfere with Plaintiff's attainment of benefits under ERISA-governed plans.

***Failed Mediation***

64. The parties participated in mediation before the Honorable Donald G. Wilkerson (Ret.), a JAMS mediator.

65. Prior to private mediation, the EEOC offered the parties an opportunity to mediate Plaintiff's charge. Microsoft refused to participate in EEOC-sponsored mediation.

66. Before the private mediation, Plaintiff informed Microsoft's counsel that she had a medical condition that made it difficult to sit for extended periods, and requested that the

mediation be limited in duration. Microsoft's counsel represented that the mediation would last approximately three hours.

67. Despite this representation and Plaintiff's disclosed medical limitations, Microsoft extended the mediation to approximately twelve hours—four times the promised duration—without regard for Plaintiff's physical condition.

68. Mediation was unsuccessful. Microsoft's settlement offers were inadequate and failed to address the full scope of Plaintiff's damages.

69. Plaintiff exhausted all reasonable pre-litigation settlement efforts before initiating this action.

## COUNT I

## PREGNANCY DISCRIMINATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

*(42 U.S.C. § 2000e et seq.)*

70. Plaintiff realleges and incorporates by reference all preceding paragraphs.

71. Title VII, as amended by the Pregnancy Discrimination Act, prohibits discrimination against employees on the basis of pregnancy, childbirth, or related medical conditions.

72. Defendant discriminated against Plaintiff on the basis of her pregnancy by: (a) isolating Plaintiff in a non-standard reporting structure during her first pregnancy; (b) dismissing Plaintiff's pregnancy-related health concerns and attributing her physical symptoms to being “intimidated” rather than acknowledging legitimate medical issues; (c) eliminating her position while she was on pregnancy-related medical leave; (d) failing to reinstate her to her position or an equivalent position; (e) keeping her in employment limbo for over one year; (f) refusing to hire her for positions for which she was qualified; and (g) ultimately terminating her employment. While individual incidents might appear isolated, the cumulative impact of Defendant's conduct—spanning both of Plaintiff's pregnancies and continuing through her protected leave—was sufficiently severe and pervasive to create a hostile work environment based on Plaintiff's sex and pregnancy status. Plaintiff was particularly vulnerable due to her pregnancy-related medical conditions, and Defendant's managers exploited the power imbalance inherent in the employment relationship to marginalize and ultimately terminate Plaintiff.

73. The temporal proximity between Plaintiff's pregnancy, her request for extended leave, and Defendant's adverse actions—combined with Defendant's failure to articulate a legitimate, non-discriminatory reason for its conduct—establishes that Plaintiff's pregnancy was a motivating factor in Defendant's decisions.

74. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer damages including, but not limited to, lost wages and benefits, lost career opportunities, emotional distress, humiliation, and damage to her professional reputation.

## COUNT II

## FMLA INTERFERENCE

*(29 U.S.C. § 2615(a)(1))*

75. Plaintiff realleges and incorporates by reference all preceding paragraphs.

76. The FMLA prohibits employers from interfering with, restraining, or denying the exercise of any right provided under the FMLA.

77. Plaintiff was an "eligible employee" under the FMLA. Defendant was a covered employer under the FMLA.

78. Plaintiff took FMLA-qualifying leave for a serious health condition related to her pregnancy.

79. Defendant interfered with Plaintiff's FMLA rights by: (a) making the decision to eliminate her position while she was on FMLA leave, as Defendant admitted in its EEOC Position Statement; (b) initially blocking Plaintiff from formally requesting extended leave until she escalated to the Head of Human Resources; (c) failing to restore Plaintiff to her original position or an equivalent position upon her ability to return, in direct violation of 29 U.S.C. § 2614(a)(1); (d) denying Plaintiff the full benefits of FMLA leave; and (e) using Plaintiff's exercise of FMLA rights as a negative factor in employment decisions. Defendant's conduct demonstrates willful violations of the FMLA, entitling Plaintiff to liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii).

80. As a direct and proximate result of Defendant's interference with Plaintiff's FMLA rights, Plaintiff has suffered and continues to suffer damages.

## COUNT III

## FMLA RETALIATION

*(29 U.S.C. § 2615(a)(2))*

81. Plaintiff realleges and incorporates by reference all preceding paragraphs.

82. The FMLA prohibits employers from retaliating against employees for exercising their FMLA rights.

83. Plaintiff engaged in protected activity by: (a) taking FMLA leave for a serious health condition related to her pregnancy; (b) requesting an extension of that leave; and (c) communicating with Defendant regarding her FMLA rights.

84. Defendant retaliated against Plaintiff by: (a) eliminating her position immediately after she requested extended leave; (b) keeping her in employment limbo for over one year; (c) deciding not to fill positions for which she was a final candidate; and (d) ultimately terminating her employment.

85. There is a causal connection between Plaintiff's protected activity and Defendant's adverse actions, as demonstrated by the close temporal proximity and the pattern of conduct.

86. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer damages.

## COUNT IV

## DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE

*(42 U.S.C. § 12112)*

87. Plaintiff realleges and incorporates by reference all preceding paragraphs.

88. The ADA prohibits covered employers from discriminating against qualified individuals on the basis of disability, including failing to provide reasonable accommodations.

89. Plaintiff experienced pregnancy-related medical conditions that substantially limited one or more major life activities, qualifying her as an individual with a disability under the ADA.

90. Plaintiff requested reasonable accommodations, including extended medical leave, 100% remote work due to her pregnancy-related medical conditions, and accommodations to attend and present at a major industry conference.

91. Defendant failed to engage in the interactive process required by the ADA. Defendant denied Plaintiff's request for 100% remote work, requiring her to report to the office at least three days per week despite her pregnancy-related medical conditions. This denial constitutes disparate treatment: Defendant granted 100% remote work arrangements to other employees, including Plaintiff's own supervisor, who did not have a disability requiring such accommodation. Defendant also denied Plaintiff's request for conference accommodations and initially blocked Plaintiff from formally requesting extended leave until she escalated to the Head of Human Resources.

92. As a direct and proximate result of Defendant's failure to accommodate, Plaintiff has suffered and continues to suffer damages.

## COUNT V

## ASSOCIATIONAL DISABILITY DISCRIMINATION

*(42 U.S.C. § 12112(b)(4))*

93. Plaintiff realleges and incorporates by reference all preceding paragraphs.

94. The ADA prohibits discrimination against a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

95. Plaintiff has a minor child with a qualifying disability under the ADA. Plaintiff's child requires ongoing specialized medical services, including ABA therapy, which are covered by Defendant's employee health benefits plan at substantial cost—approximately $600,000 annually. Defendant was aware of these ongoing medical expenses.

96. In September 2024, Plaintiff formally requested a transfer to Washington State to access specialized medical services for her child.

97. Defendant denied this request and subsequently eliminated Plaintiff's position.

98. Defendant discriminated against Plaintiff because of her association with an individual with a disability. Under the "expense justification" theory of associational discrimination, an employer violates the ADA when it takes adverse action against an employee based on concerns that the employee's association with a disabled individual will result in increased healthcare or insurance costs to the employer. Plaintiff's termination eliminated Defendant's ongoing obligation to provide health benefits covering her child's substantial medical expenses, providing Defendant with a direct financial motive for the adverse employment action.

99. Plaintiff alleges that Defendant's knowledge of the substantial cost of her child's medical care—approximately $600,000 annually—combined with the timing and effect of Defendant's actions, supports a reasonable inference of discriminatory motive. Direct evidence of discriminatory intent is not required; circumstantial evidence, including the temporal proximity between Defendant's knowledge of the costs and the adverse employment action, is sufficient to establish liability under the ADA.

100. As a direct and proximate result of Defendant's associational discrimination, Plaintiff has suffered and continues to suffer damages.

## COUNT VI

### ERISA INTERFERENCE

*(29 U.S.C. § 1140)*

101. Plaintiff realleges and incorporates by reference all preceding paragraphs.

102. ERISA § 510 prohibits employers from interfering with the attainment of any right to which a participant may become entitled under an ERISA plan.

103. Plaintiff was a participant in ERISA-governed benefit plans sponsored by Defendant, including short-term disability, long-term disability, and retirement plans.

104. Defendant improperly classified Plaintiff's post-maternity medical leave as a continuation of prior leave rather than a new qualifying event, thereby reducing her disability benefits.

105. Defendant's conduct was motivated, at least in part, by a desire to interfere with Plaintiff's attainment of benefits under ERISA-governed plans.

106. As a direct and proximate result of Defendant's ERISA violations, Plaintiff has suffered and continues to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amber Montgomery respectfully requests that this Court enter judgment in her favor and against Defendant Microsoft Corporation and award the following relief:

A. Compensatory damages for lost wages, lost benefits, lost bonuses, lost equity compensation, and other economic losses in an amount to be proven at trial;

B. Front pay or, in the alternative, reinstatement to Plaintiff's former position or an equivalent position;

C. Liquidated damages under the FMLA in an amount equal to Plaintiff's back pay and benefits;

D. Compensatory damages for emotional distress, mental anguish, humiliation, and loss of enjoyment of life;

E. Punitive damages as permitted by law;

F. Pre-judgment and post-judgment interest;

G. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k), 29 U.S.C. § 2617(a)(3), 42 U.S.C. § 12205, and 29 U.S.C. § 1132(g);

H. Declaratory and injunctive relief as appropriate;

I. Such other and further relief as this Court deems just and proper.

Any numerical estimates provided herein are preliminary and conservative, based on information presently available to Plaintiff, and are subject to increase upon discovery. Plaintiff reserves the right to amend this Complaint to seek additional damages as discovery proceeds.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**Amber Montgomery, Esq.**
Georgia Bar No. 265386
ALM Legal, LLC
3600 Dallas Hwy Ste #230-388
Marietta, GA 30064
Telephone: (912) 800-9039
Facsimile: (912) 527-2912
Email: amontgomery@alm-legal.com

*Attorney for Plaintiff, Appearing Pro Se*

Dated: December 21, 2025